IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BEARY LANDSCAPING, INC., | ) | |
| GREAT LAKES LANDSCAPE CO., INC., | ) | |
| MAHONEY & ASSOCIATES, LLC, | ) | |
| McGINTY BROS., INC., | ) | |
| NATURAL CREATIONS | ) | |
| LANDSCAPING, INC., PEDERSON CO., | ) | |
| REIL CONSTRUCTION, INC., SEBERT | ) | |
| LANDSCAPING CO., STAN'S | ) | |
| LANDSCAPING, INC., WALSH | ) | |
| LANDSCAPE CONSTRUCTION, INC., | ) | No. 05 C 5697 |
| BRIAN BEARY, JOHN CEDERLUND, | ) | |
| JOSE GARCIA, SANDRA HARYNEK, | ) | |
| CLINTON J. MAHONEY, CHARLES P. | ) | Judge Mark Filip |
| McGINTY, SR., PAUL F. PEDERSON, | ) | |
| STANLEY PEDERSON, JEFFREY | ) | |
| SEBERT, and JOHN R. WALSH III, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ART LUDWIG, in his official capacity | ) | |
| as Director of the Illinois Department | ) | |
| of Labor, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs identify themselves as are a group of landscape contracting companies and

individual taxpayers. (D.E. 34 at 1.)[1] Specifically, Plaintiffs identify Beary Landscaping, Inc.,

Great Lakes Landscape Co., Inc., Mahoney & Associates, L.L.C., McGinty Bros., Inc., Natural

Creations Landscaping, Inc., Pederson Co., Reil Construction, Inc., Sebert Landscaping Co.,

---

[1] The designation "D.E." refers to the docket entry of the cited document, followed by the appropriate
page or paragraph number.

Stan's Landscaping, Inc., and Walsh Landscape Construction, Inc., as "Landscape Contractors." (*Id.*) Plaintiffs identify Brian Beary, John Cederlund, Jose Garcia, Sandra Harynek, Clinton J. Mahoney, Charles P. McGinty, Sr., Paul F. Pederson, Stanley Pederson, Jeffrey Sebert, and John R. Walsh III as "Individual Taxpayers" who also are officers and owners of the Plaintiff Landscape Contractors. (*Id.* at 1, ¶ 8.) Plaintiffs have filed suit against Art Ludwig ("Defendant"), in his official capacity as Director of Illinois Department of Labor ("IDOL") for injunctive and declaratory relief, claiming that the IDOL's enforcement of the Illinois Prevailing Wage Act ("IPWA"), 820 ILCS 103/1 *et seq.*, deprives Plaintiffs of their rights to due process and equal protection of laws. Defendant moves to dismiss Plaintiffs' suit pursuant to Fed. R. Civ. P. 12 (b)(6) or, in the alternative, for this Court to abstain from proceeding at this time "in light of a pending parallel state-court proceeding that addresses the same dispute." (D.E. 23 at 1.) For the reasons stated herein, the Court grants Defendant's motion to dismiss in part and denies it in part.

I.  Background Allegations[2]

A.  Plaintiffs Allegations and Relevant Provisions of the Illinois Prevailing Wage Act

Plaintiffs allege that the Landscape Contractors have bid on and performed landscape projects for the State or Illinois or municipalities within it. (D.E. 34 ¶ 5.) Plaintiffs also allege that the IPWA as enforced by Defendant violates their constitutional rights. Therefore, Plaintiffs

---

[2] The background facts are taken from Plaintiffs' First Amended Complaint (D.E. 34), which is referred to herein simply as the "Complaint." The factual allegations are assumed to be true, as precedent requires, for present purposes. The Court takes no position concerning whether any of the allegations are actually well-founded.

2

ask the Court to enjoin enforcement of the IPWA against them as it relates to projects they

perform in an area consisting of the following Illinois counties: Cook, DuPage, Grundy, Kane,

Kendall, Lake, McHenry, and Will. (Id.)

By way of background, the IPWA provides that:

[i]t is the policy of the State of Illinois that a wage of no less than the general
prevailing hourly rate as paid for work of a similar character in the locality in
which the work is performed, shall be paid to all laborers, workers and mechanics
employed by or on behalf of any and all public bodies engaged in public works.

IPWA, 820 ILCS 103/1.

Section 3 of the IPWA requires that workers engaged in the construction of public works

be paid "the general prevailing rate of hourly wages for work of a similar character . . . in the

locality in which the work is performed." Id., 820 ILCS 130/3.

Section 9 of the IPWA provides that:

To effectuate the purpose and policy of this Act each public body shall, during the
month of June of each calendar year, investigate and ascertain the prevailing rate
of wages as defined in this Act and publicly post or keep available for inspection
by any interested party in the main office of such public body its determination of
such prevailing rate of wage and shall promptly file, no later than July 15 of each
year, a certified copy thereof in the office of the Secretary of State at Springfield
and the office of the Illinois Department of Labor.

Id., 820 ILCS 130/9.

In the event that any public body does not ascertain the prevailing wage as specified in

820 ILCS 103/9, the same section specifies that:

The Department of Labor shall during the month of June of each calendar year,
investigate and ascertain the prevailing rate of wages for each county in the State.
If a public body does not investigate and ascertain the prevailing rate of wages
during the month of June as required by the previous paragraph, then the
prevailing rate of wages for that public body shall be the rate as determined by the
Department under this paragraph for the county in which such public body is

3

located.

*Id.*, 820 ILCS 103/9.

The IPWA also provides that:

At any time within 30 days after the Department of Labor has published on its official web site a prevailing wage schedule, any person affected thereby may object in writing to the determination or such part thereof as they may deem objectionable by filing a written notice with the public body or Department of Labor, whichever has made such determination, stating the specified grounds of the objection. It shall thereafter be the duty of the public body or Department of Labor to set a date for a hearing on the objection after giving written notice to the objectors at least 10 days before the date of the hearing and said notice shall state the time and place of such hearing. Such hearing by a public body shall be held within 45 days after the objection is filed, and shall not be postponed or reset for a later date except upon the consent, in writing, of all the objectors and the public body. If such hearing is not held by the public body within the time herein specified, the Department of Labor may, upon request of the objectors, conduct the hearing on behalf of the public body. [. . . .] At such hearing the public body or Department of Labor shall introduce in evidence the investigation it instituted which formed the basis of its determination, and the public body or Department of Labor, or any interested objectors may thereafter introduce such evidence as is material to the issue. Thereafter, the public body or Department of Labor must rule upon the written objection and make such final determination as it believes the evidence warrants, and promptly file a certified copy of its final determination with such public body and the Secretary of State, and serve a copy by personal service or registered mail on all parties to the proceedings. The final determination by the Department of Labor or a public body shall be rendered within 30 days after the conclusion of the hearing.

*Id.*, 820 ILCS 130/9. This determination of the IDOL is thereafter subject to review in the

Illinois courts; review of agency action therefore is available before an Illinois Administrative

Law Judge, and further judicial review, including in the Illinois appellate courts, is available

under the provisions of the Illinois Administrative Review Law, 735 ILCS 3-101 *et seq.* (*E.g.*,

D.E. 46-1, 46-2, 46-3.)

Plaintiffs—through the putative lens of both substantive and procedural aspects of the

4

Due Process Clause of the Fourteenth Amendment, as well the Equal Protection Clause—object to the prevailing wage calculations of the IDOL as they concern various workers in the landscaping industry in Illinois. As one might guess, Plaintiffs contend that the prevailing wages that Plaintiffs have been determined to owe their workers by the IDOL in its application of the Illinois Prevailing Wage Act are too high and that Plaintiffs actually should be required to pay lower wages to their workers under the Illinois statute.

For example, Plaintiffs claim that the IDOL prevailing wage schedules improperly fail to delineate separate wage classification schedules for landscape laborers, as opposed to using more general classifications for laborers or construction laborers. (*E.g.*, D.E. 34 ¶¶ 34, 42-47.) Plaintiffs contend that this practice improperly (indeed, unconstitutionally) requires them to pay unduly high wages to their laborers and other workers under the Illinois Prevailing Wage Act. Plaintiffs also contend that the IDOL fails to conduct certain investigations required to determine the prevailing wage under the Illinois Prevailing Wage Act and that this failure has led to an erroneously high calculation of the prevailing wage for their landscape workers on affected projects. (*E.g.*, *id.* ¶¶ 24, 33, 51-53.)

Plaintiffs also allege that there is no "process an affected party [can] use to object to IDOL's application of its laborer, operating engineer, and truck driver classifications and rates to Landscape Work on public projects" in Cook, DuPage, Grundy, Kane, Kendall, Lake, McHenry, and Will Counties. (*Id.* ¶ 83.[3]) Plaintiffs further allege that the process contemplated by IPWA

---

[3] Although not material to the Court's analysis, this allegation appears to be false. The same lawyers who represent Plaintiffs represent the Illinois Landscape Contractors Association (also "ILCA"), of which many of the Plaintiffs are members. As discussed further below, the ILCA has been unsuccessfully litigating the propriety of at least some wage classifications in the landscape industry in Illinois administrative and circuit court proceedings. Although those

Section 9 (see above) is ineffective because "the Department has a custom, policy or practice of postponing or resetting hearing dates without the consent, in writing, of all the objectors." (*Id.* ¶ 85.) These continuances lead, Plaintiffs contend, to the IDOL's adjudications occurring more slowly than the 45-day time frame contemplated by the IPWA. (*Id.* ¶¶ 89-90.) Somewhat paradoxically, Plaintiffs argue that Section 9 proceedings are constitutionally flawed because they afford insufficient time for an objector to assemble the requisite evidence for the administrative proceeding. (*See id.* ¶¶ 92-93.) Plaintiffs make this contention, notwithstanding that it is undisputed that the IDOL allows an objector "full written discovery, including service of interrogatories, document requests and motions to compel," and that an objector can present evidence and make evidentiary objections to improper evidence being offered at IDOL proceedings. (*Id.* ¶ 88.)

Plaintiffs raise a variety of other procedural objections concerning the IDOL proceedings, which are discussed below in the relevant sections of the opinion. By way of brief example, Plaintiffs appear to contend that it is procedurally unconstitutional that IDOL has a 20% administrative penalty if it determines that Illinois workers on public projects have been underpaid, and therefore that when the IDOL determines that a landscape contractor has underpaid its workers, that 20% penalty must be paid up front or else a 2% monthly surcharge

challenges have been rejected, they certainly have been occurring. Nor have the proceedings been perfunctory. Both the opinion of the Illinois Administrative Law Judge, and the opinion of the Circuit Court of Du Page County, Illinois, contained extensive analyses. The results of these proceedings were adverse to the objector ILCA, but it is difficult to see how Plaintiffs can fairly contend that "there was no process an affected party could use to object to the IDOL's application of its laborer, operating engineer, and truck driver classifications and rates to Landscape Work on public parties in the Eight Counties." (D.E. 34 ¶ 83; *see also id.* ¶ 82 (alleging that the inability to object presently confronts putative objectors).)

will be assessed concerning the laborer payment deficiency on behalf of the affected worker(s). (*Id.* ¶ 148; D.E. 27 at 6.) Plaintiffs also appear to suggest that the IDOL engages in unconstitutional delays in instituting enforcement/wage collection actions in Illinois courts if a contractor refuses to pay assessed shortfalls on employee wages—which delays Plaintiffs state "often" can be longer than a year before a suit is filed. (D.E. 34 ¶ 152.)[4] Plaintiffs also contend that if a member of the public so requests, the IDOL will provide a list of contractors who have received first notices of violations of the IPWA. (*Id.* ¶ 157.) Plaintiffs contend that there is no hearing under the IPWA to contest a notice of first violation, but only to contest a notice of a second violation. (*Id.* ¶¶ 159, 161.)

Plaintiffs also provide a laundry list of alleged violations of state law (*i.e.*, alleged violations of the IPWA) that the IDOL is engaging in through its alleged misapplication of the Illinois Prevailing Wage Act. (*See id.*, Count IV (entitled "Due Process — Statutory Violations" of the IPWA).) These putative state law violations—as well as the fact that state law violations are not cognizable in a claim under 42 U.S.C. § 1983—are discussed as appropriate below.

With respect to their Equal Protection claim, Plaintiffs allege that the Defendant employs a different methodology to determine prevailing wages in the landscaping industry in the counties at issue than the IDOL uses to calculate prevailing wages in the construction industry. (*Id.* ¶¶ 185-186.) Plaintiffs further allege that the IDOL engages in certain conduct as a punitive reaction to landscape companies (like Plaintiffs) which do not have workers organized by the Laborers Union but instead have workforces organized by other unions or no unions at all. (*E.g.*,

---

[4] Plaintiffs do not suggest that a one-year delay is outside the applicable limitations period set by Illinois law. Any delay outside the limitations period naturally would afford a complete defense to an objector.

7

*id.* ¶¶ 189-90, 192, 194.) Plaintiffs claim that the "IDOL has not engaged in the disparate treatment described herein to serve any rational government purpose." (*Id.* ¶ 193.)

In the five counts of Plaintiffs' Complaint, they present a wide-ranging set of putative theories of liability under the substantive and procedural components of the Due Process Clause of the Fourteenth Amendment, as well as an Equal Protection claim. These theories and counts are discussed in detail, as relevant, below. In terms of relief, Plaintiffs seek an order: "[p]reliminarily and permanently enjoining and restraining [Defendant] Ludwig, any agent of Ludwig, and/or anyone acting in concert with Ludwig from taking any action against the Landscape Contractor Plaintiffs to enforce the Act as to any public project performed by employees of said Plaintiffs" in the eight Illinois counties identified above and an order declaring IDOL's prevailing wage schedules for those eight counties as applied to Landscape Work performed after July 2, 2002[5] "null and void." (*Id.* at 21, 27, 30, 33-34, 36.)

    B.    The Illinois Administrative and State Court Proceedings Implicated By Defendant's *Younger* Abstention Claim

Plaintiffs, with the exception of one Landscape Contractor and the Individual Taxpayer owner/officer Plaintiffs, are all members of a trade association named the Illinois Landscape Contractors Association (also, "ILCA"). (D.E. 27 at 3.) On July 8, 2004, the ILCA submitted petitions pursuant to IPWA Section 9 to the IDOL objecting to, *inter alia*, "omission of the classifications of plantsman, lead plantsman, landscape installer . . . and landscape truck driver from IDOL's July 2004 prevailing wage schedules." (D.E. 24, Ex. B at 3.) The ILCA also

---

[5] The Court ignores for present purposes Plaintiffs seeming attempt to use Section 1983, which has a statute of limitations of two years, *see, e.g., Savory v. Lyons,* 469 F.3d 667, 672 (7th Cir. 2006), to affect payments concerning contracts or wage payments that predate the two-year limitations period applicable to this suit, which was filed in the middle of 2005.

8

objected to the "IDOL's position (as set forth in the wage schedules) that 'landscaping work falls under the existing classifications for laborer. . . . The work performed by landscape plantsman . . . is covered by the existing classification of laborer.'" (*Id.* at 4 (punctuation in original).) A three-day evidentiary hearing was conducted on the ILCA's petitions in March 2005. (*Id.* at 4-5.) In June 2005, the administrative law judge issued a 21-page order dismissing the ILCA's petitions and finding that "[P]etitioner did not sustain . . . [its] burden of proof that separate classifications are necessary for plantsman, lead plantsman, and installer in the counties at issue under this proceeding. This Order is final and subject to appeal in accordance with the [Illinois] Administrative Review Law." (*Id.* at 5.) The ILCA then filed suit against Defendant and IDOL, among others, in Illinois state court seeking to overturn the administrative decision. (*Id.*, Ex. B.) In the state court action, the ILCA raised at least some of the same issues that Plaintiffs raise here. The Circuit Court for Du Page County, Illinois, rejected the ILCA's challenge and confirmed the administrative judge's findings of fact and conclusions of law in March 2006. (D.E. 46-2.) The ILCA filed a Notice of Appeal and, as far as the Court is aware, the case is pending in the Illinois Court of Appeals. (D.E. 46-3.)

## II.  Standard of Review

Defendant has moved to dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6). A Rule 12(b)(6) motion to dismiss challenges the sufficiency of the complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *accord Johnson v. Rivera*, 272 F.3d 519, 520-21 (7th Cir. 2001). In ruling on the motion, the Court accepts all well-pleaded facts alleged in the complaint as true and affords the plaintiff all reasonable inferences from those facts. *See Lee v. City of Chicago*, 330 F.3d 456, 459 (7th Cir.

9

2003). In considering a motion to dismiss, a court may take judicial notice of matters in the public record. *See Palay v. United States*, 349 F.3d 418, 425 n. 5 (7th Cir. 2003). A complaint should not be dismissed for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

## III.  Discussion

Defendant raises two issues—(1) whether Plaintiffs can ground Article III jurisdiction for their claims, and (2) whether, even if there is Article III jurisdiction, abstention is appropriate under *Younger v. Harris*, 401 U.S. 37 (1971)—that logically must be addressed at the threshold of the analysis. As explained below, there is Article III jurisdiction, at least in some of the narrower forms Plaintiffs invoke, even if their more expansive "taxpayer-standing" arguments appear foreclosed by precedent. In addition, *Younger* abstention is not appropriate under the facts and circumstances of this case, for the reasons explained below.

A.  The Court Has Jurisdiction Under Article III to Proceed, and *Younger* Abstention Is Not Appropriate

1.  The Court Has Jurisdiction Under Article III

Near the conclusion of Defendant's motion to dismiss, Defendant contends that "Plaintiffs lack standing to bring the instant lawsuit in federal court." (D.E. 24 at 12.) Because subject matter jurisdiction is a threshold issue concerning the propriety of this Court proceeding at all, the Court addresses it first. As explained below, the Court respectfully rejects Defendant's contention that there is no Article III jurisdiction for this case as presented.

Some of Defendant's arguments about standing appear to be correct. First, Plaintiffs'

10

seeming suggestion that they have "taxpayer standing" (D.E. 27 at 15) appears to be mistaken. Just as taxpayer standing is not available to challenge the actions of the federal government, it also is not available to challenge the actions of a state government or agency. *See, e.g., Lance v. Coffman*, 127 S. Ct. 1194, 1196-97 (U.S. March 5, 2007) (citing, *inter alia, DaimlerChrysler Corp. v. Cuno*, 547 U.S. ___, ___, 126 S. Ct. 1854, 1862 (2006)).[6] Defendant also argues that Plaintiffs have no litigable interest in any future government contract they may or may not receive. (D.E. 24 at 12.) Plaintiffs appear to concede the validity of this proposition (*see* D.E. 27 at 8), and the Court will assume *arguendo* that the parties are correct on this score.

Nonetheless, as Plaintiffs argue, they can successfully ground Article III standing with respect to the IDOL's actions because those actions implicate the Plaintiffs' ability to retain money on state and/or municipal contracts that already have been completed by the Plaintiff companies or Plaintiff owners. *See id.* ("[T]he Landscape Contractors all have **performed**

---

[6] Plaintiffs cite two cases, *Crusius v. Illinois Gaming Board*, 807 N.E.2d 1307 (Ill. App. Ct. 2004) and *Bradley v. Casey*, 114 N.E.2d 681 (Ill. 1953), which (particularly as to *Crusius*) appear to allow a taxpayer-standing theory to ground a suit in the Illinois courts. However, suits in state courts, as opposed to federal courts, are not subject to Article III standing requirements, so the fact that Illinois courts may not require Article III demands to be fulfilled is not germane for present purposes. Moreover, Plaintiffs offer no authority to suggest that the fact that state courts may not follow Article III standing requirements somehow transmogrifies state standing law into an interest that would be entitled to due process protections under Section 1983. Even if that proposition were true, however, it would merely mean that Plaintiffs could argue about the propriety of the procedures used by the IDOL in administering the IPWA—which Plaintiffs already are able to do as a result of the property interest they have identified in monies related to completed contracts and potential penalties. (*See* page 29, *infra*). It would not mean, though, that this Court could pass, in *Lochner* Era-fashion as Plaintiffs suggest this Court should under substantive due process review, on the wisdom or sensibility of every state decision concerning the expenditure of state tax revenues. That focus is not a matter of process, but instead implicates substantive judgments and policy choices outside the framework of procedural due process. *See, e.g., Lightfoot v. District of Columbia*, 448 F.3d 392, 398 (D.C. Cir. 2006) (per curiam) (rejecting the idea that Section 1983 could be used to review the substantive decisions of a state or local agency applying state or municipal law); *id.* at 401 ("The quality of an agency's reasoning is decidedly not a process issue.") (Silberman, J., concurring, citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 50-51 (1983)).

Landscape Work on projects covered by the IPWA, and the property interests they claim arise out of that performance.") (emphasis in original). This basis for the suit allows Plaintiffs to litigate the claims here under Article III, regardless of whether Plaintiff's more expansive "taxpayer standing" or other jurisdictional theories are well founded.

>    2.    *Younger* Abstention Is Not Required

In *Younger v. Harris*, 401 U.S. 37, 53 (1971), the Supreme Court held that, absent extraordinary circumstances, federal courts should abstain from interfering with ongoing state criminal proceedings. *See Simpson v. Rowan*, 73 F.3d 134, 137 (7th Cir. 1995). Precedent has since expanded application of the *Younger* doctrine to state proceedings that are civil or quasi-criminal in nature. *See, e.g., Huffman v. Pursue, Ltd.*, 420 U.S. 592, 605-07 (1975) (state civil nuisance proceedings concerning obscene book store and its products); *Trust & Investment Advisors, Inc. v. Hogsett*, 43 F.3d 290, 294-95 (7th Cir. 1994) (teaching that *Younger* abstention "has also been applied to certain state administrative proceedings that are judicial in nature.") (citing *Middlesex County Ethics Comm. v. Garden State Bar Assoc.*, 457 U.S. 423 (1982) (lawyer disciplinary proceeding initiated by state ethics committee); *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619 (1986) (barring injunction against an ongoing sex discrimination proceeding before state civil rights commission)).

Defendant argues that abstention is appropriate in this case because "[i]n both the state and federal cases involving Plaintiffs, the relief sought is the same." (D.E. 24 at 13.) Plaintiffs disagree, arguing that because the ILCA is the plaintiff in the state court action, and because that action was initiated by the ILCA, *Younger* does not apply. (D.E. 27 at 6-8.)

Certain Seventh Circuit precedent counsels against application of *Younger* abstention

here. Specifically, in *Nader v. Keith*, 385 F.3d 729 (7th Cir. 2004), the Seventh Circuit emphasized that an important consideration concerning the propriety of *Younger* abstention is whether the State has initiated prior enforcement proceedings against the plaintiffs, or whether, as is the situation in the instant case, the plaintiffs are simply pursuing parallel relief in both state and federal fora. *Id.* at 732 (collecting cases). Because the State has not initiated any proceeding against the plaintiffs in the instant suit, that factor cuts in favor of proceeding, as opposed to abstaining, here. *Id.*; *accord, e.g., SSDD Enterprises, Inc. v. Village of Lansing*, No. 95 C 6064, 1997 WL 176576, at *5 n.13 (N.D. Ill. April 4, 1997) ("*Younger* abstention typically arises where a party has an action filed against him in state court to enforce an ordinance or statute, and he commences suit in federal court challenging the legislation's constitutionality.") (collecting cases).

In addition, as the individual Plaintiffs point out, they are not parties, at least strictly speaking, in the state administrative proceedings initiated by the Illinois Landscape Contractors' Association. (It appears that the Plaintiff companies are all or virtually all members of the ILCA, but that does not change the outcome, given the other circumstances concerning the case.) This Court does not put undue weight on this factor, given that it appears that the Illinois Landscape Contractors Association is represented by the selfsame attorneys as the Plaintiffs here, so there is a degree of artificiality to the weight that Plaintiffs would place on this factor. Nonetheless, the fact remains that at least some Plaintiffs, strictly speaking, are not parties to the state administrative and carry-on judicial proceedings.

Finally, the Court notes that the state administrative proceedings are, as precedent characterizes it, "remedial" as opposed to "coercive" in nature. *See Ohio Civil Rights Comm'n,*

477 U.S. at 627 n.2 ("Unlike *Patsy* [*v. Florida Board of Regents*, 457 U.S. 496 (1982)], the administrative proceedings here are coercive rather than remedial, began before any substantial advancement in the federal action took place, and involve an important state interest."). Perhaps this is simply another way of accounting for the fact that the state did not initiate the administrative proceeding, and that the ILCA (which has many Plaintiffs among its members) did. In any event, to the extent this factor adds content to the analysis, this factor also cuts against abstention, because proceeding in this case will not disrupt any enforcement-type proceeding initiated by regulatory authorities of the State of Illinois.

For all of these reasons, the Court respectfully declines to abstain from proceeding in this litigation under *Younger*. Accordingly, the Court proceeds to evaluate the sufficiency of Plaintiffs' various pleaded claims under Rule 12(b)(6).

B.      Many of Plaintiffs' Claims Are Subject to Dismissal, But Not All of Them

1.      Plaintiffs Cannot Invoke Section 1983 To Litigate Alleged State Law Errors

In evaluating Plaintiffs' claims under Rule 12(b)(6), the Court is compelled to emphasize at the outset that Plaintiffs cannot invoke Section 1983 to litigate alleged state law errors.[7] Plaintiffs repeatedly complain about putative errors of state law that Defendant allegedly is committing under the Illinois Prevailing Wage Act: this theme literally permeates substantial portions of the operative Complaint.

This entire theory of liability is fundamentally flawed under applicable precedent. It is

---

[7] Precedent teaches that Plaintiffs have no direct cause of action to litigate constitutional claims, and that therefore Plaintiffs must proceed under 42 U.S.C. § 1983. *See, e.g., Baxter v. Vigo County Sch. Corp.*, 26 F.3d 728, 732 n. 3 (7th Cir. 1994); *Bennett v. Roberts*, No. 96 C 6917, 2001 WL 290188, at *10 (N.D. Ill. Mar. 16, 2001) (citing *Baxter*, 26 F.3d at 732 n. 3).

well settled that an error of state law is not a violation of the federal Due Process Clause, such that every error of state law would also be a federal constitutional violation. In this regard, the Seventh Circuit recently underscored its teaching that "'[f]ailure to implement state law violates that state law, not the [United States] Constitution; the remedy lies in state court.'" *Germano v. Winnebago County, Illinois*, 403 F.3d 926, 929 (7th Cir. 2005) (quoting *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 767 (7th Cir. 2003)). *Germano* accordingly affirmed dismissal of the plaintiff's Section 1983 claim, notwithstanding that the Court assumed that "the Winnebago County policy is in violation of . . . state law." *Id.*, 403 F.3d at 927-28.

The teaching in *Germano*, while crucial, is not new. For example, in *Jones v. Thieret*, 846 F.2d 457 (7th Cir. 1988), the Seventh Circuit taught that

> It has long been understood that a state may violate its own law without violating the Constitution, *e.g., Gryger v. Burke*, 334 U.S. 728, 731 (1948): "We cannot treat a mere error of state law, if one occurred, as a denial of due process; otherwise, every erroneous decision by a state court on state law would come here as a federal constitutional question."

*Id.*, 846 F.2d at 460 (collecting numerous Supreme Court cases). Furthermore, precedent instructs that claims that are, in essence, state law claims, cannot be given constitutional "window dressing" in order to circumvent this basic limitation on Section 1983 actions. *See, e.g. Archie v. City of Racine*, 847 F.2d 1211, 1217 (7th Cir. 1988) (rejecting "the contention that the Constitution requires a state to obey its own law. A reader could see in the phrase 'due process of law' a requirement of 'obedience to law,' and there is some historical support for such a view . . . . The phrase does not have such a meaning for the contemporary [Supreme] Court, however, for that body has rejected the equivalence repeatedly, *e.g., Barney v. City of New York*, 193 U.S. 430 (1904); *Hebert v. Louisiana*, 272 U.S. 312, 316 (1926); *Snowden v. Hughes*, 321 U.S. 1, 11

15

(1944); *Davis v. Scherer*, 468 U.S. 183, 193-96 (1984)."); *see also, e.g., Snowden*, 321 U.S. at 11 ("Mere violation of a state statute does not infringe the Federal Constitution. And state action, even though [allegedly] illegal under state law, can be no more or less constitutional under the Fourteenth Amendment than if it were sanctioned by the state legislature.") (internal citations omitted). In this regard, *Archie* further instructed that

> A state ought to follow its law, but to treat a violation of state law as a violation of the Constitution is to make the federal government the enforcer of state law. State rather than federal courts are the appropriate institutions to enforce state rules. Indeed, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.

*Id.* at 1217 (internal quotation marks and citation omitted); *accord, e.g., Eftekhara v. Ill. Dep't. of Children & Family Servs.*, 661 F. Supp. 522, 529 (N.D. Ill. 1987) ("'The enforcement of state regulations is to be done through the state court system and not in an action under § 1983.'") (quoting *Goodrich v. Newport News Sch. Bd.*, 743 F.2d 225, 227 (4th Cir. 1984)).

This well settled teaching warrants dismissal of Count IV of the Complaint. It is fundamentally predicated on the mistaken notion that alleged errors and violations by Defendant concerning the interpretation and application of the Illinois Prevailing Wage Act constitute a Due Process violation. Indeed, Count IV is entitled, "Due Process — Statutory Violations," and the statute of which Plaintiffs speak is not any federal statute but rather the Illinois Prevailing Wage Act. *See also, e.g.*, D.E. 27 (Plaintiffs' response to the motion to dismiss) at 3 ("IDOL has violated the Due Process Clause by failing to follow numerous provisions of the IPWA . . . .").) Count IV repeatedly contends that the Defendant has violated the Illinois statute. No less than nine times it begins paragraphs with the allegation, "Contrary to the [Illinois] Act's requirements . . .," or "Contrary to this provision [of the Illinois Act] . . .," and it then continues to explain why

16

Plaintiffs believe Defendant is misapplying Illinois law. (D.E. 34 ¶¶ 166-172, 174, 177.) The

Count concludes by alleging that, "By failing to follow the [state] statutory provisions described

herein, IDOL has deprived Plaintiffs" of Due Process of law. (*Id.* ¶ 183.)

Under the precedent cited above, this theory is fundamentally defective. Moreover, the

theory underlying Count IV—*i.e.*, that alleged[8] violations of state law violate the Due Process

Clause—is inconsistent at its root with applicable precedent, such that it cannot be "cured" with

more specific or modified averments. Count IV is therefore dismissed with prejudice.

Although somewhat less clearcut, the same error appears to infect Count I of the

Complaint, which expressly identifies and quotes at length from a 1953 Illinois Supreme Court

decision, *Bradley v. Casey*, 114 N.E.2d 681 (Ill. 1953), and argues that the present system

employed by the IDOL to determine the prevailing wage in the landscaping industry violates a

non-delegation principle articulated in the *Bradley* decision. (*See, e.g.*, 34 ¶ 104 (block quoting

from *Bradley*, 114 N.E.2d at 685).)

The quoted passage from *Bradley*, however, appears to be an exposition of Illinois

constitutional law, which is also not a claim of error cognizable under Section 1983. *Bradley*

appears to have drawn relatively little attention in subsequent caselaw in Illinois (or elsewhere),

---

[8] It bears mention that some, if not much, of Plaintiff's theory of alleged state law error depends on contestable interpretive issues about the provisions and language of the state statute. A federal court is not an ideal forum in which to litigate these issues, even if (which is not the case) a proven state law error could ground Section 1983 relief. That is true because federal courts (as opposed to state courts) are not able to definitively interpret state laws—*see, e.g. Erie R.R. v. Tompkins*. 304 U.S. 64, 78 (1938)—such that even the United States Supreme Court is bound by the interpretation of a state statute by that state's courts, regardless of whether the Supreme Court might think the interpretation improvident or mistaken, unless there is an independent constitutional defect in the interpretation. *Accord, e.g., Jones v. Theriot*, 846 F.2d 457, 460 (7th Cir. 1988) (quoting *Garner v. Louisiana*, 368 U.S. 157, 166 (1961), where the Supreme Court stated, "We of course are bound by a State's interpretation of its own statute and will not substitute our judgment for that of the State . . . .").

17

but to the extent it is discussed, it is understood as stating a state law principle. Thus, in *Mahin v. Myers*, 247 N.E.2d 812 (Ill. App. Ct. 1969), both the litigant citing *Bradley* and the Illinois Court of Appeals understood the *Bradley* decision to concern a non-delegation principle grounded in Article III of the Illinois Constitution. *See Mahin*, 247 N.E.2d at 817.[9] The only other decision discussing *Bradley* at any length, *Niagra Frontier Milk Distributory Bargaining Agency v. Wickham*, 274 N.Y.S.2d 299 (N.Y. Sup. Ct. 1966), discussed *Bradley* in the context of analyzing Article III of the New York state constitution, which also addressed delegation in the context of legislative authority. *See id.* at 300 ("The prohibition against the delegation of legislative power by an administrative agency is of course found in our constitution (article 3, Section 1, New York State Constitution).") (citing *Bradley, supra*).

Count I receives little attention in the briefs concerning the motion to dismiss, and it does not appear to be the focus of the litigation. It also, as explained, appears to be predicated on an allegation of state law error, which is not cognizable via Section 1983. Nonetheless, in an abundance of caution, this claim is dismissed without prejudice.

        2.        Count II Does Not State a Cognizable Substantive Due Process Claim

Count II is entitled "Due Process — No Rational Basis." (D.E. 34 at 22.) In it, Plaintiffs complain that the laborer categories that the IDOL uses in the landscaping industry for prevailing

---

[9] Article III of the Illinois Constitution in force at the time *Bradley* was decided (the Illinois Constitution of 1870) was entitled "Distribution of Powers," and it read: "The powers of the government of this state are divided into three distinct departments—the legislative, executive and judicial; and no person, or collection of persons, being one of these departments, shall exercise any power properly belonging to either of the others, except as hereinafter expressly directed or permitted." *Id.* The current version of the Illinois Constitution in force, the Illinois Constitution of 1970, does not contain the exact same provision. Article II, Section 1 of that document states: "The legislative, executive and judicial branches are separate. No branch shall exercise powers properly belonging to another." *Id.*

wage purposes are different from the ones used by the U.S. Department of Labor (presumably for federally funded landscape work) in relevant areas of Illinois. (*E.g.*, *id.* ¶¶ 122-24.) For example, the IDOL does not break "landscape laborer" or "landscape plantsman" out of a more general category of "laborer," and this has consequences (for Plaintiffs, negative ones) concerning the calculated prevailing wage owed to Plaintiffs' workers on state and municipally funded projects in Illinois. (*E.g.*, *id.* ¶¶ 123-25.) Plaintiffs have similar complaints about the classifications for workers who operate landscaping machinery, and whether they should be classified as "landscape equipment operators" as opposed to categorized within the more general title of "operating engineer." (*Id.* ¶¶ 132-33.) Plaintiffs allege that this administrative scheme lacks a rational or reasoned basis, and further allege that it violates Section 3 of the Illinois Prevailing Wage Act, which "requires that workers engaged in construction of public works be paid 'the general prevailing rate of hourly wages **for work of a similar character** . . . in the locality in which the work is performed.'" (*Id.* ¶ 139 (quoting 820 ILCS 130/3 (emphasis added by Plaintiffs)).)

The fact that a state agency allegedly misinterprets or misapplies a state statute is, for reasons explained above, not a proper subject for a Section 1983 suit. *See, e.g.*, *Archie*, 847 F.2d at 1218 ("When the source of the rule or duty in question . . . is not the Constitution but is within the control of political actors, federal courts have no rule external to the state's choices to enforce. We have only state law, which states may enforce, alter, or disregard so far as the Due Process Clause is concerned."); *id.* at 1217 n.6 (explaining that "a violation of state law does not a constitutional claim make"). Such a claim (*i.e.*, that a state agency has misinterpreted or misapplied a state statute the agency is charged with enforcing) is instead the substance of state

court litigation—typically in the first instance in state administrative law proceedings, and thereafter, if either party is dissatisfied with that outcome, in subsequent proceedings in the state courts. That is exactly what is occurring concerning the question of whether the IDOL should recognize landscape-industry-specific categories for planters and laborers—or whether those tasks are sufficiently like more general laboring tasks that they fairly can be considered "work of a similar character" within more general listings—for purposes of Section 3 of the Illinois Prevailing Wage Act. As explained, the Illinois Landscape Contractors Association, on behalf of itself and its members, filed an administrative action concerning this very subject, and the Illinois Administrative Law Judge held a three-day evidentiary hearing at which the parties as well as the intervenors were allowed to introduce evidence. (D.E. 24-4 at 26.) In that proceeding, the Illinois ALJ found that there was insufficient justification for creating new categories for Illinois Prevailing Wage Act purposes for the landscape industry, and that the IDOL had permissibly applied the Illinois statute. (See, e.g., 24-5 at 9.) Thereafter, the ILCA (which is represented by the same counsel as Plaintiffs in the instant case, and which includes many of the Plaintiffs among its members) filed a complaint for administrative review in the Circuit Court of DuPage County, Illinois. (D.E. 24-4 at 2-24, Ex B.[10]). The Circuit Court of DuPage County has ruled in favor of the IDOL, with the Circuit Judge stating, *inter alia*, that the administrative record established that the "skills that are used [by the landscape workers which Plaintiffs assert should be subject to separate landscaping-specific classifications] are very, very similar" to those used by other workers in the general laborers' categories in which Plaintiffs' employees are included

---

[10] The Illinois ALJ's 21 page written ruling is included as "Exhibit A" to the Illinois Landscape Contractors Association's complaint for administrative review filed in the Circuit Court of DuPage County Illinois, which itself is docketed as Exhibit A to D.E. 24-4.

20

by the IDOL). (D.E. 46-3 at 13.) At present, the ILCA is receiving further review of that ruling in the Illinois Court of Appeals. (*See* D.E. 46-3, Ex. C.) Whatever happens in that appeal, the upshot of all this is that, as explained by the precedent discussed at length above, alleged misinterpretations of the Illinois statute by the IDOL are not proper subjects for a Section 1983 claim.

Plaintiffs attempt to elide by this precedent by claiming that the actions of the Illinois agency lack a reasoned or rational basis. This sort of claim—that an agency has not provided a reasoned basis for its actions, or that they are arbitrary or irrational—is a familiar one to federal courts. However, it is an analysis seen in suits concerning actions of federal agencies or actors subject to review under the federal Administrative Procedures Act.

However, Section 1983 cannot be used as a vehicle to transfer disputes about every state agency action in the nation to the federal courts through the assertion that the agency has acted irrationally or failed to provide a reasoned basis for its acts, such that the Due Process Clause is offended. Thus, in *Lightfoot v. District of Columbia*, 448 F.3d 392 (D.C. Cir. 2006) (per curiam), a distinguished panel of the D.C. Circuit, which included Circuit Judges Garland, Silberman, and Williams, taught that "a § 1983 suit is not one to review actions of a state agency," and it further noted that "[f]ederal appellate courts have no general appellate authority over state courts or state agencies." *Id.*, 448 F.3d at 398 (quoting *Hameetman v. City of Chicago*, 776 F.2d 636, 640 (7th Cir.1985)); *accord id.* at 400 (Silberman, J., concurring) ("Under the APA we, of course, have a broad charge to ensure the reasonableness of agency action-setting it aside when arbitrary and capricious-but this is not an APA case.") (citation omitted). Federal courts—typically the D.C. Circuit—evaluate the propriety of federal agency actions concerning

21

all sorts of diverse issues. *See, e.g., Nuvio Corp. v. F.C.C.*, 473 F.3d 302, 303 (D.C. Cir. 2007) (rejecting challenge that the FCC had engaged in arbitrary and unreasoned action concerning the setting of its deadlines for Voice over Internet Provider (VoIP) telephone service companies to provide certain services concerning "non-native area code" telephone access); *South Coast Air Quality Management District v. E.P.A.*, 472 F.3d 882, 897 (D.C. Cir. 2006) (rejecting challenge from various parties that EPA had engaged in arbitrary, capricious, and unreasoned decisionmaking concerning certain one-hour and eight-hour ambient air quality standards under the Clean Air Act). However, Plaintiffs offer no basis to suggest that Section 1983 can be used, via a boilerplate substantive Due Process claim, to transfer a nation's worth of state administrative law challenges to the federal courts—many of which challenges, incidentally, if not most, would essentially implicate questions of state statutory interpretation and state public policy-making that federal courts are ill-situated to perform. *Accord, e.g., Lightfoot*, 448 F.3d at 401 (Silberman, J., concurring) (rejecting the idea "that the Due Process Clause can be used as a looming super-arbitrary-and-capricious standard governing the substantive decisions" of a local administrative agency); *see generally Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844-45 (1984) (discussing policy aspects of administrative action).

Plaintiffs also suggest that this claim is viable as a so-called "substantive due process" claim. (D.E. 27 at 12.) It has been an awfully long time, however, since federal courts readily entertained arguments of employers like Plaintiffs that state laws or regulations concerning their workers' wage rates should be struck down as violative of any substantive provision of the Due Process Clause. As the Supreme Court said over a half-century ago, with teaching that was well-settled even at that time, "[t]he day is gone [when courts will use] the Due Process Clause of the

22

Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought." *Williamson v. Lee Optical*, 348 U.S. 483, 488 (1955). Or, as the Supreme Court stated over a century ago, in rejecting a challenge that Kansas's method of prescribing wage rates for laborers on state and municipal projects in Kansas violated the Due Process clause, "it belongs to the state, as the guardian and trustee for its people, and having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf, or on behalf of its municipalities. [. . . . ] Regulations on this subject suggest only considerations of public policy. And with such considerations the courts have no concern." *Atkins v. State of Kansas*, 191 U.S. 207, 222-23 (1903) (Harlan, J.). The *Atkins* Court thus rejected a challenge that Kansas improperly applied its statute to require payment of $1.50 per day for laborers for 8-hour only work days on public projects, when the prevailing $1.50 wage in the general marketplace was based on a 10-hour day, and therefore, the employers asserted, the Kansas scheme violated the Due Process clause. *Id.* at 208-09. The *Atkins* Court explained that it had no basis, on grounds simply of "justice or reason or wisdom" to annul the Kansas scheme under the Due Process Clause and that the state scheme was not unconstitutional as applied or crafted. *Id.* at 223.[11]

---

[11] The Seventh Circuit has similar teaching. In *Coyne-Delaney Co., Inc. v. Capital Development Bd. of the State of Illinois*, 616 F.2d 341 (7th Cir. 1980) (per curiam), the Seventh Circuit emphasized that a state can require an interested contractor who seeks the State's business to meet whatever commercial conditions the State might require. *See id.* at 342 ("Like private individuals and businesses, the Government enjoys the unrestricted power . . . to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases.") (internal quotation marks and citation omitted). *Coyne-Delaney* further rejected the notion that the State's specifications for a certain product, which effectively foreclosed the plaintiff in that case from competing for the public contracts at issue, were unconstitutional

23

To be sure, contemporary jurisprudence permits substantive due process challenges to the content of government actions or regulations under limited circumstances. Thus, in *Washington v. Glucksberg*, 521 U.S. 702 (1997), the Supreme Court stated that substantive due process protects against "government interference with certain fundamental rights and liberty interests." *Id.*, 521 U.S. at 720 (collecting cases). *Glucksberg* further teaches that those fundamental rights and liberties must objectively be "deeply rooted in this Nation's history and tradition," *id.* at 720-21 (internal quotation marks and citation omitted); *see also id.* at 720 (collecting substantive due process precedent concerning matters seemingly far afield from this case, including substantive due process decisions concerning marriage, the upbringing and education of one's children, and reproductive matters). Under the *Glucksberg* standard, when performing a substantive due process analysis, "the court must narrowly formulate the asserted constitutional right. After formulating the asserted right, the court must ask whether it is 'deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it was] sacrificed.'" *Galdikas v. Fagan*, No. 01 C 4268, 2001 WL 1223539 *2 (N.D. Ill. Oct. 12, 2001) (citing *Glucksberg*, 521 U.S. at 720-21); *accord, e.g. Doe v. City of Lafayette, Ind.*, 377 F.3d 757, 768-69 (7th Cir. 2004).

_____

because they were "wholly arbitrary, capricious, and without reasonable justification." Id. at 343 n. *. The Seventh Circuit indicated that when the State is contracting, it may base its purchasing decisions on "whimsical, arbitrary, or idiosyncratic criteria." *Id.* While *Coyne-Delaney* cannot be read, of course, to suggest that the State could readily contract along racial lines, or to contract only with Protestants and not Jews, Catholics, or Hindus, it does teach that Plaintiffs' claim that the wages the IDOL has determined that Plaintiffs must pay their workers on public projects are "irrationally high" is not a basis for relief. Furthermore, to the extent the proposed unfair or irrational height of the employee wages stems from alleged violations or errors under the Illinois Prevailing Wage Act, those supposed errors of state law are not cognizable in this Section 1983 action.

24

Plaintiffs cannot remotely satisfy the *Glucksberg* standard, and they have provided ample averments to make clear that their substantive due process claim is doomed. The Seventh Circuit has repeatedly emphasized that "[t]he scope of substantive due process . . . is very limited and protects plaintiffs only against arbitrary government action that 'shocks the conscience.'" *Montgomery v. Stefaniak*, 410 F.3d 933, 939 (7th Cir. 2005) (quoting *Tun v. Whitticker*, 398 F.3d 899, 902 (7th Cir. 2005)); *accord, e.g., Tun*, 398 F.3d at 902 (stating that government conduct implicating substantive due process "is most often described as an abuse of government power which 'shocks the conscience.'") (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952)).

With all respect, the pleaded averments come nowhere near meeting the "shocks the conscience" standard, nor do the alleged actions of the IDOL contravene any fundamental tenet "implicit in the concept ordered liberty." *E.g., Palko v. Connecticut*, 302 U.S. 319, 325 (1937). The idea that a state regulatory agency allegedly has failed to appreciate that work performed by landscape laborers or vehicle drivers in certain Illinois counties is sufficiently unlike the work performed by other laborers or vehicle drivers in the maintenance or construction trades generally—such that the regulator allegedly has failed to create landscaping-specific wage categories so as to comply with the IPWA's command that wages must be calculated for "for work of a similar character . . . in the locality in which the work is performed"—is hardly the stuff that "shocks the conscience" of civilized people. Nor do Plaintiffs other allegations—that a regulator has failed to sufficiently verify or investigate certain data, or has committed various state law errors, or even has favored one union over another—come anywhere near "conscious shocking" or violating norms that people traditionally view as baseline benchmarks of "ordered liberty."

In this regard, for example, the Seventh Circuit in *Tun* explained that

It is one thing to say that officials acted badly, even tortiously, but—and this is the essential point—it is quite another to say that their actions rise to the level of a constitutional violation. We have declined to impose constitutional liability in a number of situations in which we find the officials' conduct abhorrent. For instance . . . [i]n *Schaefer v. Goch*, 153 F.3d 793 (7th Cir.1998), there was no substantive due process violation when officers shot a woman to death on her own front steps during a standoff with the woman's husband.

*Id.*, 398 F.3d at 903; *see also, e.g., id.* at 902 (discussing the "high threshold for substantive due process claims"); *Tinker v. Beasley*, 429 F.3d 1324, 1326 (11th Cir. 2005) (rejecting claim that police violated plaintiff's substantive due process rights in a multi-day police interrogation in which they told her, *inter alia*, that her lawyer had "bailed out" on her, that she would never see her children again unless she confessed, and that she had two options-the electric chair or life in prison-all where plaintiff was innocent of any crime); *Khan v. Gallitano*, 180 F.3d 829, 836 (7th Cir. 1999) (stating, in affirming Rule 12(b)(6) dismissal of case involving alleged improper interference by government officials concerning contract between plaintiff and her client regarding commercial real estate lease that, "[w]e conclude, therefore, that the *Glucksberg* fundamental rights analysis generally applies in substantive-due-process cases . . . ."); *see also id.* (stating that plaintiff's "remedy is to seek state tort damages, which she is free to do in state court").

The result is no different to the extent Plaintiffs are claiming a general liberty interest to be free from misguided government regulation. "'There is no general liberty interest in being free from capricious government action.'" *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 949 (9th Cir. 2004) (quoting *Nunez v. City of Los Angeles*, 147 F.3d 867, 873 (9th Cir. 1998)); *accord, e.g., City of Cuyahoga Falls v. Buckeye Community Hope Foundation*, 538 U.S. 188,

200 (2003) (Scalia, J., concurring) ("Those who claim 'arbitrary' deprivations of non-fundamental liberty interests must look to the Equal Protection Clause."); Laurence H. Tribe, American Constitutional Law § 16-2, at 1439 (2d ed. 1988) ("The Supreme Court, from its earliest examination of socioeconomic regulation, has considered that *equal protection* demands reasonableness in legislative and administrative classifications.") (emphasis added); *id.* at 1443 (explaining that, "[i]n applying the rationality requirement [under the Equal Protection Clause], the Court has ordinarily been willing to uphold any classification based upon a state of facts that reasonably can be conceived to constitute a distinction, or difference in state policy. This remarkable deference to state objectives has operated in the sphere of economic regulation quite apart from whether the conceivable 'state of facts' (1) actually exists, (2) would convincingly justify the distinction if it did exist, or (3) was ever urged in the classification's defense either by those who promulgated it or by those who argued its support.") (internal quotation marks and citations omitted). In the context of the instant case, at least, this is probably just another way of saying that Section 1983 cannot be combined with a substantive due process claim to effectively federalize all of state administrative law; if a simple "liberty" interest were enough, then virtually all citizens touched by any state administrative action could, even where they could not identify a cognizable property interest, use their generic "liberty interest" along with a substantive due process claim to litigate whether any state administrative action or policy decision was arbitrary and capricious. Plaintiffs cite no authority in support of this scenario.

Moreover, to the extent that Plaintiffs suggest that they may be complaining about unequal treatment, that it is claim that must be analyzed under Equal Protection jurisprudence and not under the more amorphous principle of substantive due process. *See, e.g., Banks v. City*

27

*of Whitehall*, 344 F.3d 550, 554 (6th Cir. 2003) (citations omitted). The Court analyzes

Plaintiffs' contentions under Equal Protection precedent at the end of the opinion, and finds that

Plaintiffs do state certain Equal Protection claims, but that does not mean that Plaintiffs have a

colorable substantive due process claim as well.[12]

Count II fails to come anywhere near the applicable "shock the conscience" standard set

forth in applicable precedent. Plaintiffs may have an Equal Protection claim; they may have a

state law claim; but they do not have a substantive due process claim that their employees' wages

have been calculated too high under the IPWA. Count II is dismissed with prejudice.

---

[12] Plaintiff's principal citation in support of their substantive due process contention, *Northwestern University v. City of Evanston*, No. 00 C 7309, 2001 WL 219632 (N.D. Ill. 2001), as well as the Seventh Circuit decision it relied on, *Doherty v. City of Chicago*, 75 F.3d 318 (7th Cir. 1996), concerned government regulation of real property/land use decisions. The Supreme Court has made clear that the applicable substantive due process review standard can be influenced by context—*see County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998) ("Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscious shocking")—so it is unsurprising that land use regulation (which often is litigated against the backdrop of the demands of the Takings Clause) would entail a somewhat different mode of substantive due process analysis than generic wage regulation for laborers. *Doherty*'s formulation for the applicable standard of review certainly appears to be linked to the land use context: "we have recognized the potential for a substantive due process claim in the context of land-use decisions that are arbitrary and unreasonable, bearing no substantial relationship to the public health, safety or welfare." *Id.*, 75 F.3d at 325. The Seventh Circuit has underscored, in post-*Doherty* jurisprudence, that the most-common formulation of the substantive due process standard to employ is the "shock the conscience" standard, under which Plaintiffs' putative substantive due process claim clearly fails. *See Tun*, 398 F.3d at 902 (citing *Rochin*, 342 U.S. at 172). Plaintiffs have offered no authority suggesting a deviation from this presumptive standard. In the absence of any further authority, the Court respectfully declines to deviate from the typical standard, particularly given that the subject matter at issue in this suit—an employer's claim that substantive Due Process requires striking down employee wage rates set under a state laborer-protection scheme—is literally at the epicenter of the sorts of cases that prompted the substantive due process retreat from the *Lochner* Era in the first place.

3.       Count III States A Procedural Due Process/Property Claim
          But States No Procedural Due Process/Liberty Claim

          (i)      Plaintiffs Have Stated a Procedural Due Process/Property Claim

Plaintiffs allege that they have a property interest in the money from public landscaping

contracts that they allegedly should not be paying to their workers in the form of excess wages,

and that Plaintiffs have procedural due process rights relating to the IDOL's determination of

how much money must be paid to the Plaintiffs' landscape workers. Defendant's threshold

objection to the idea of such a procedural due process/property claim is that Plaintiffs have no

property right in any future state contracts, which is true, but Plaintiffs correctly argue that they

can litigate their procedural due process claim through the vehicle of the money that the Plaintiff

landscaping companies have earned on extant contracts they have performed.[13] As a result, it

appears, at least based on the pleadings, that Plaintiffs have identified a cognizable property

interest.

The idea that a State must follow procedural due process when resolving a citizen's claim

concerning his or her property is an orthodox one. For the reasons explained below, Plaintiffs

nonetheless come close to pleading themselves out of court on this claim by raising a series of

procedural due process objections that appear meritless. Nonetheless, the nuances of these issues

---

[13] As previously discussed, there may be statute of limitations issues concerning Plaintiffs' seeming demand that the prevailing wage calculations for all projects they have performed since 2002 be declared "null and void." *See* Note 5, *supra.* There also would be a fundamental due process problem if Plaintiffs attempted to use any judgment to recoup monies from their laborers, as the laborers are not parties to this suit, as well as potential laches issues if Plaintiffs attempted to recoup monies in any theoretical future state court suit. (No federal suit would be possible as there would not be the requisite complete diversity of citizenship, and no federal question would seemingly be presented in any such theoretical landscape company/landscape workers suit.) Nonetheless, Plaintiffs contend that they have monies they have retained concerning ongoing projects and/or monies implicated by potential state laborer-underpayment penalties on ongoing contracts, and those contentions would appear to constitute a sufficient property interest to allow Plaintiffs to advance their procedural due process/property claim.

29

are sufficiently ignored in the briefs, and the standards of Rule 12(b)(6) review are sufficiently generous to Plaintiffs, that the Court will allow this claim to stand. The Court offers no prognosis about the future of the claim.

In terms of the procedural defects the Plaintiffs offer concerning the IDOL wage determination process, there is a substantial argument that all of them fail. For example, Plaintiffs claim that their procedural due process rights are violated because, once the IDOL determines that they have paid their laborers inadequate wages under the IPWA, the IDOL "refuses to settle any case" unless the employer pays the full amount of wages determined to be owed as well as a 20% penalty specified by the IPWA. (D.E. 27 at 12.) Plaintiffs offer no authority, and the Court is aware of none, that would suggest that it is *unconstitutional* under the Federal Constitution for a State to refuse engage in settlement negotiations, when acting pursuant to its police powers and authority to promote the public welfare, after an employer has been determined to have paid affected laborers less than their due wages on public projects.

To take another example, Plaintiffs suggest that they cannot obtain requisite evidence to raise any Section 9 challenge under the IPWA (D.E. 34 ¶¶ 92-93); however, this claim appears baseless given that Plaintiffs concede that an objector in a Section 9 proceeding is allowed to take "full written discovery, including service of interrogatories, [to make] document requests, and [to make] motions to compel." (*Id.* ¶ 88.) Plaintiffs also claim that there is insufficient time to assemble evidence for the IDOL proceeding; however, this contention is difficult to credit given that Plaintiffs also suggest that the IDOL has a practice of issuing continuances, even if the objectors do not consent, such that the proceedings do not finish within the 45-day period contemplated by the IPWA but instead take up to eleven months to complete—which eleven-

month period presumably is alleged to be somehow unconstitutional. (*Id.* ¶¶ 89-90, 92.)

To take another example, Plaintiffs suggest that their constitutional rights are infringed because, if they refuse to pay amounts determined to be owed their laborers by the IDOL, then the IDOL does not sue them quickly enough in state court enforcement/collection actions, with the IDOL recently "often" taking "more than a year to file such enforcement actions after a Demand Letter was issued." (*Id.* ¶ 152.) Plaintiffs do not suggest that this delay is outside the limitations period under Illinois law (which would afford a complete defense anyhow); moreover, the Court would need to ignore reality to fail to appreciate that government regulators at the federal and state levels often take more than a year to file enforcement actions, with interest and penalties typically accruing until full payment is made.

Plaintiffs also suggest that the IDOL acts unconstitutionally in requiring prepayment of disputed amounts even if an objector wants to challenge the assessment. (D.E. 27 at 12.) Plaintiffs' contention, strictly speaking, is materially incomplete, in that an objector seemingly needs to prepay only if it wants to avoid incurring monthly surcharges assessed on behalf of the employees in question that will be due if an objector's position about employee wages is eventually rejected. In any event, the idea that the government can require prepayment of disputed amounts during the period that the objector's claim is resolved is a common one in the law; the IRS and state authorities routinely require such payment of assessed amounts. *See Rosewell v. LaSalle National Bank*, 450 U.S. 503, 528 (1981) (holding that the Illinois real estate tax process provided a "plain, speedy and efficient" procedure for resolving objections, notwithstanding that taxpayers are required to pay under protest, no interest is provided for refunds, and objections often take two years to resolve, such that plaintiff could not advance a

31

Section 1983 suit concerning disputed funds); *id.* at 523 (noting that "state tax systems commonly provide[] for payment of taxes under protest with subsequent refund as their exclusive remedy."); *accord, e.g., McKesson Corp. v. Division of Alcoholic Beverages and Tobacco, Department of Business Regulation of Florida,* 496 U.S. 18, 37 (1990) ("[W]e have long held that a State may employ various financial sanctions and summary remedies, such as distress sales, in order to encourage taxpayers to make timely payments prior to resolution of any dispute over the validity of the tax assessment").[14]

Perhaps most fundamentally, all of Plaintiffs' procedural due process objections proceed as though Plaintiffs cannot avail themselves of other avenues of relief seemingly available under Illinois law (*e.g.,* filing a declaratory action in the Illinois courts) so as to litigate their contentions that the IDOL methodology for calculating prevailing wages for landscape workers under the IPWA fails to comport with the demands of that statute. Any IDOL limitations on discovery that might exist would not apply to such an action, and it would proceed, from a point in time selected by the Plaintiffs, at a pace presumably at least equivalent to the pace of civil litigation in the State of Illinois[15]—which Plaintiffs do not even suggest is in violation of the Federal Constitution. As the Seventh Circuit has taught,

> While a plaintiff is not required to exhaust state remedies to bring a § 1983 claim, this does not change the fact that no due process violation has occurred when adequate state remedies exist. The whole idea of a procedural due process claim is that the plaintiff is

---

[14] This argument, along with the general "delay" theme in Plaintiffs' contentions, appear to be further undermined by the fact that the IPWA provides that, for purposes of review in the Illinois courts, "[a]ny proceeding in any court affecting a determination of the Department of Labor or public body shall have priority in hearing and determination over all other civil proceedings pending in said court, except election contests." 820 ILCS 130/9.

[15] *See* note 14, *supra,* concerning the priority that IWPA-related actions enjoy in the Illinois courts under Illinois law.

suing because the state failed to provide adequate remedies. Therefore, we do not require a plaintiff to pursue those remedies in order to challenge their adequacy, but likewise we do not allow a plaintiff to claim that she was denied due process just because she chose not to pursue remedies that were adequate. Given the availability of state remedies that have not been shown to be inadequate, plaintiffs have no procedural due process claim.

*Veterans Legal Def. Fund v. Schwartz*, 330 F.3d 937, 941 (7th Cir. 2003) (internal quotation marks and citation omitted); *see also id.* at 939-40 ("For some deprivations due process includes a predeprivation hearing, but post-deprivation remedies are a constitutionally acceptable substitute for predeprivation remedies in many procedural due process cases.") (internal quotation marks and citation omitted); *Ellis v. Sheahan*, 412 F.3d 754, 756 (7th Cir. 2005) (denying a claim of a due process violation and stating that "plaintiff had to show that the property was taken away from her without notice and the opportunity for a hearing at which she could try to contest the deprivation. She had and indeed still has adequate procedural routes by which to obtain such a hearing.") (collecting cases).

Nonetheless, the potential adequacy of the State's avenues of review concerning the disputed funds did not receive fulsome treatment in the briefs. In addition, the level of review under Rule 12(b)(6) is forgiving for the Plaintiffs. Plaintiffs' procedural due process/property claim at least survives Rule 12(b)(6) review.

        (ii)     There is No Liberty Interest to Ground a Due Process Claim

Plaintiffs suggest that they have a procedural due process/liberty claim concerning the stigma that they can suffer if they are determined by IDOL to have violated the IPWA, which triggers the issuance to the landscaping company of a "First Notice of Violation." (D.E. 27 at 13; D.E. 34 ¶ 156.) Plaintiffs further explain that, "[u]pon request by any member of the general public, IDOL publishes the names of all contractors who have received First Notices of

33

Violation, including the names of Plaintiff Landscape Contractors that have received such Notices." (D.E. 27 at 13; D.E. 34 ¶ 157.) Plaintiffs state that the IPWA does not provide for a hearing before issuance of a First Notice of Violation, although they concede that such a hearing is available if a second notice is issued. (*Id.* ¶ 161.) Plaintiffs explain that, with respect to a First Notice of Violation, the Landscape Contractors, "[w]ithout the benefit of any hearing," face the IDOL "disseminat[ing] this stigmatizing assertion to the public, thus impairing the Landscape Contractors' ability to secure future contracts." (D.E. 27 at 14.) For the reasons explained below, these allegations fail to state a claim under applicable precedent.

Although Plaintiffs never identify the seminal caselaw underlying this putative claim, Plaintiffs (as well as the single unpublished district court case they offer) are referring to what is generally known as a stigma-plus claim under *Paul v. Davis*, 424 U.S. 693 (1976). In *Davis*, the Supreme Court rejected a Section 1983 procedural due process/liberty claim based on the government's alleged defamatory act of distributing a flyer to 800 merchants in the Louisville area that erroneously included the plaintiff's name and photograph on a list of "Active Shoplifters." *Id.*, 424 U.S. at 695. The plaintiff's inclusion on the list was based on a criminal charge to which he pleaded not guilty and which later was dismissed. *Id.* at 695-96. The flyer came to the attention of the plaintiff's employer, which told the plaintiff that he would not be fired but that "he had best not find himself in a similar situation in the future." *Id.* at 696 (internal punctuation omitted). The *Davis* plaintiff asserted that his inclusion on the list, without appropriate procedural protections to combat against error (*id.* at 701), deprived him of the liberty of freely entering business establishments that received the flyer without fear of being arrested again; the *Davis* plaintiff further alleged that the flyer "would seriously impair his future

34

employment opportunities." *Id.* at 697.

The Supreme Court held that these allegations were inadequate to identify a liberty interest that triggered the procedural due process guarantee of the Fourteenth Amendment. *Id.* at 711-12. The Court taught that even a government declaration that stigmatized the subject of that statement, so as to be viewed by the public in a different way, did not identify a protectable liberty interest unless the government altered "a right or status previously recognized by state law" in conjunction with the allegedly stigmatizing statement. *Id.* at 711. In the absence of such a material legal alteration of status, mere "stigma" alone was insufficient. *Id.*; *see also id.* at 698 (noting that if the plaintiff's position were accepted, "a person arrested by law enforcement officers who announce that they believe such person to be responsible for a particular crime in order to calm the fears of an aroused populace" thereafter could litigate against the officers under Section 1983).

Where, as here, the alleged stigmatizing impact of supposedly false statements is a diminution of the attractiveness of the plaintiff in the eyes of future employers, the Seventh Circuit has repeatedly emphasized that the government's allegedly stigmatizing statements must have "the effect of blacklisting" the plaintiff "from employment in comparable jobs." *Trejo v. Shoben*, 319 F.3d 878, 889 (7th Cir. 2003) (collecting cases; internal quotation marks omitted); *accord, e.g., Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001) (stating that the plaintiff's "good name, reputation, honor or integrity must be called into question in a manner that makes it virtually impossible" for the plaintiff "to find new employment in his chosen field") (collecting cases); *Perry v. Fed'l Bureau of Investigation*, 781 F.2d 1294, 1302 (7th Cir. 1986) ("Although dissemination of the FBI memorandum may have lessened Perry's employment opportunities in

35

certain areas of the federal government, a liberty interest is not implicated merely by a reduction in an individual's attractiveness to potential employers.") (collecting cases).

In their Complaint, Plaintiffs have failed to outline or adumbrate any basis by which the Court could conclude that they have a viable *Paul v. Davis* claim. In addition, the averments and arguments that Plaintiffs affirmatively put forward are inconsistent with the idea of a stigma-plus claim: mere alleged "impairing" of "the Landscape Contractors' ability to secure future contracts" from the public (D.E. 27 at 14) by virtue of disclosure of a First Notice of Violation is not consistent with any idea of an effective blacklisting, as precedent requires. Moreover, there is no reasonable inference that can be drawn that the disclosure that a particular landscaping company has been initially determined to have once violated the IPWA on a landscaping project would be taken by a reasonable member of the public as being so heinous as to foreclose the possibility of future employment—particularly given the holding in *Davis*. That conclusion is reinforced by the fact that, as Plaintiffs concede, a hearing is available in connection with the issuance of a Second Notice of Violation (*see* D.E. 34 ¶ 161). In addition, Plaintiffs do not contend that there is any legal alteration of status accompanying a single issuance of a Notice of Violation, as *Davis* and its progeny also require.

For all of these reasons, any *Paul v. Davis* claim is dismissed. While it appears unlikely that Plaintiffs can state a viable claim of this sort, in an abundance of caution, the Court dismisses any *Davis* claim without prejudice.

    4.      Count V Does Plead an Equal Protection Claim

In Count V, Plaintiffs allege that the IDOL uses a different method to calculate prevailing wages in the landscaping industry in the counties under dispute than IDOL uses to calculate

36

prevailing wages in the construction industry. (D.E. 34 ¶¶ 185-186.) Plaintiffs also allege that the IDOL issues compliance requests to landscape companies who do not have collective bargaining agreements with the "Laborers Union" (seemingly a reference to the Construction and General Laborers District Council of Chicago and Vicinity) but instead have collective bargaining agreements with other unions or perhaps with no union at all. (*E.g., id.* ¶¶ 189-90.) In support of their Equal Protection claim, Plaintiffs, curiously, do not allege that the IDOL fails to request compliance information from other landscape companies; instead, Plaintiffs allege that the IDOL "has not required that the Laborers Union provide it with any evidence of noncompliance with the [Illinois Prevailing Wage] Act."[16] (*Id.* ¶ 190.) Plaintiffs allege that this putative "disparate treatment"— the Court will ignore for the moment the fact that Plaintiffs do not actually allege that other *employers* (as opposed to the Laborers Union) are being treated differently—is the product of punitive animus by the IDOL towards employers who do not have collective bargaining agreements with the Laborers Union. (*E.g., id.* ¶¶ 192, 194.) Plaintiffs allege that the "IDOL has not engaged in the disparate treatment described herein to serve any rational government purpose." (*Id.* ¶ 193.)

These allegations, if construed generously, can be read to state an Equal Protection claim. First, if the IDOL is drawing lines between market actors with literally no coherent reason for the disparate treatment, that can implicate the Equal Protection clause. *See, e.g., New Orleans v. Dukes,* 427 U.S. 297, 303 (1976) (per curiam). This sort of equal protection claim has not fared

---

[16] Presumably, the entities which keep payroll records for landscape workers are the landscaping *companies*—not any union that might represent the respective company's workers. That is why federal courts in this district entertain hundreds, if not thousands, of ERISA suits every year filed by benefit funds of various unions, which suits seek payroll records from companies who have ceased making benefits contributions or are suspected of making deficient contributions. Put differently, the unions do not pay employee wages in the landscaping industry; the landscaping companies do.

well in the economic arena for many, many years, as the level of review for line-drawing in the economic sphere, at least with regard to issues that do not implicate fundamental rights or proceed along suspect lines like race or national origin, is extraordinarily deferential. Thus, for example, in *Dukes*, the Supreme Court rejected the claim that a municipal regulation was exclusionary, monopolistic, and irrational—which rule banned pushcart food vendors from New Orleans's French Quarter generally but exempted vendors who had been there for more than eight years. *Id.* at 305. The Supreme Court found that the regulation's propriety was "obvious," *id.* at 304, and in overturning the court of appeals' conclusion that it was irrational to hypothesize "that a present eight year veteran . . . will operate in a manner more consistent with the traditions of the Quarter than would any other" pushcart vendor, the Supreme Court went so far as to overrule the only one of its cases "in the last half century to invalidate a wholly economic regulation solely on equal protection grounds." *Id.* at 306; *see also City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985) ("When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes.") (citation omitted).

The fact that market-regulation Equal Protection challenges have generally failed, however, is not the same thing as saying that such a claim cannot be stated under Rule 12(b)(6). Perhaps one might fairly conclude, as Defendant suggests, that Plaintiffs have pleaded themselves out of court on their Equal Protection claim by suggesting that the disparate treatment consists of the Plaintiffs' alleged disparate treatment vis-a-vis the Laborers Union, which seems to be a materially different sort of entity for the regulatory purposes at issue than the Plaintiffs.

*See* note 16, *supra.* Nonetheless, ambiguities in complaints are construed in favor of plaintiffs, so the Court will read this gap in the pleadings favorably to Plaintiffs and allow the claim to stand.

As outlined briefly above, Count V also alleges that the IDOL has punitively subjected Plaintiffs to compliance verifications in retaliation for their companies having workforces organized by labor unions other than the "Laborers Union." (*See* D.E. 34 ¶ 194 ("IDOL has engaged in the disparate treatment described herein with the intention of inhibiting or punishing the exercise by the landscape contractors of their constitutionally protected freedom to associate with . . . unions other than the Laborers Union."). This allegation may not necessarily be particularly plausible—given that presumably the Plaintiffs are precluded from interfering with any elections among their employees concerning competing unions—but it does state a claim under Rule 12(b)(6). It is also possible that the Complaint alleges that the IDOL is engaging in the allegedly punitive compliance verification efforts in retaliation for certain Plaintiffs having non-unionized workforces as opposed to workforces aligned with the Laborers Union. In either event, precedent recognizes that there are situations where a plaintiff potentially can prevail on a Section 1983 equal protection/retaliation claim concerning the exercise of a constitutional right. *See, e.g., Hoskins v. Lenear*, 395 F.3d 372, 375 (7th Cir. 2004) (per curiam) (acknowledging possibility of an equal protection/retaliation claim by prisoner alleging retaliatory transfer for filing administrative grievance). Moreover, such a claim is potentially viable, even if there is no "liberty" or "property" interest that otherwise would be required to state a Section 1983 due process claim. *See, e.g., id.* (citation omitted); *accord, e.g., DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 1999). Accordingly, Count V survives as a retaliation claim.

IV.    Conclusion

For the reasons stated above, Defendant's motion to dismiss (D.E. 23) is granted in part

and denied in part.

_____
Mark Filip
United States District Judge
Northern District of Illinois

Dated:   3-28-07